1791, number 21-1794, number 21-1795, and number 21-1805 Hamdallah v. Hamdallah et al. v. CPC Carolina LLC et al. At this time would counsel for appellant Hamdallah please introduce himself on the record. May it please the court. Good morning. My name is Jose Luis Novas and I represent appellants Hamdallah, Nieves Roman, and Nieves Acevedo. In this case regarding a failed real estate transaction the court below actually found it to be a close call whether plaintiffs could exercise a cause of action under Puerto Rico's tort statute which is article 1802 of the civil code. As a general rule of course is that parties to a contract will generally will be impeded in suing one another under a tort statute. That's a general rule. However, in this case under the applicable summary judgment standard, the court below was required to consider a number of uncontested facts that clearly were that which were clearly on the record and the court had to indulge in the light most favorable to the sellers which are the plaintiffs in this case when it erroneously determined that plaintiff's damages were due exclusively to the breach of the sale and purchase agreements. Now these uncontested facts on the record amply sustain the finding that the plaintiffs in this case suffered damages that were the result of a number of negligent omissions and culpable acts of the defendants which actually constituted a breach of the defendant's duties not to cause injury to the plaintiffs. And these were damages which stemmed from conditions that were separate or for facts that were separate from the sale and purchase agreements. If such was the case, plaintiffs were well beyond, well within their right, excuse me, to pursue a cause of action in damages as that is the rule laid out in the controlling Supreme Court of Puerto Rico case of Framos-Gonzalez. Let me see if we can, and if I'm oversimplifying, feel free to tell me, but let me see if we can try to simplify this. If you and I agree for $100, I'll sell you 20 widgets and that's our contract. And I don't deliver the widgets or I negligently fail to deliver the widgets or I negligently manufacture the widgets, you've only got a breach of contract action against me. But if I go and drive my car in and hit your car when I'm delivering the widgets or I burn your house down, you've got a separate tort action. No one would argue that because of the contract, you don't have a tort action. Which duty are you alleging was violated here and what was the source of the duty? Was it the contract to deliver, like to deliver the widgets, or was it something independent of the contract? Completely independent to the contract. And so what duty are you pointing to? It was the breach of the duty not to cause harm. What are the facts? What facts are you pointing to? That's what we're getting to, which were uncontested facts that the court had to indulge in favor of the plaintiffs. Now, for starters, the court below incorrectly characterized the real estate transaction between the parties as risky, when the fact is that the commercial development in those parcels of land of the plaintiffs. Could you go back to Judge Thompson's question? It would help me a lot, too, if I knew what. I thought what you were complaining about was that they didn't close the deal. No, the complaint, it's not that they did not close on the deal. The complaint is that plaintiffs were required months prior to a closing to vacate their respective premises, which was something beyond the contract. The contracts of sale and purchase did not contemplate that. This is an entire block in a residential area. I'm sorry. They were given notice that they had to vacate by a certain time, which was before the closing. So the notice to vacate was tied to a closing date. That's correct. The notice to vacate was tied to a closing date, but it was premature because under the agreements, plaintiffs did not have to surrender their premises until the closing date. Now, it sounds like when you say plaintiffs didn't have to surrender their premises until a closing date, you're talking about the contractual undertaking here. That's correct, Your Honor. And the other side could only require you to vacate prior to the closing date. No, the defendants could not. It was to be vacated as of the closing. The defendants could not require the plaintiffs to vacate the premises prior to the closing. No, I mean they could require, under the contract, weren't you required to be out of the premises as of the closing date? On the closing date. Yes. But not before. Well, so they're going to need to tell you before when the closing date is. The problem here was, Your Honor, that the notice to vacate the premises was months prior to the scheduled closing. So I gather it's your position that the defendant assumed that the defendant assumed some obligation to preserve the properties in the condition in which they were at the time that your clients gave up possession. I mean, you say there was a lot of damage that took place to those properties. So when the deal falls through, they get property whose value has been diminished because of all this damage. That's your contention, correct? Well, torturous conduct, Your Honor, was that not only were they required to vacate, but when plaintiffs advised that damages were being suffered by the entire vacant block, the defendant said, Do not worry. Those properties are going to be demolished. Okay. But that's not a crazy thing to have said. Both the property owners and the purchaser shared an expectation that the deal was going to close. So whatever happened to those properties wasn't going to matter, right? And that's all based on the shared expectation, based on the contract, that there's going to be a closing. So where does this duty come from that the purchaser had an obligation to preserve the properties in the condition they were at the time that your clients gave up possession? Where does that duty come from? Your Honor, quite simply, the development, as envisioned, could not take place because of restrictive covenants that encumbered the lots, something that the developers knew or should have known. And insofar as they required these people to leave their premises in advance of the closing, that could not happen. That itself was torturous. A responsible developer. Did the owners of the property know about the restrictive covenants? No, they did not, Your Honor. My clients, the owners of the properties are, one is a doctor of medicine, the other one is an auto parts store owner. The defendants, though, were well-heeled developers with plenty of experience, and there's plenty of admissions on the record that the covenants were there, and actually on the part of CVC, CVS, rather, there's an admission by their attorney that it would have been prudent to know. Well, their risk is built into the contract, because the contract specifically provided that you had to deliver clear title. So at the point that they signed it, it didn't matter to CVS, because they had it back door out anyway. So clear title was going to be? In other words, the expectation regarding the covenants, which is the point that you're trying to make, is an expectation. And the risk associated with that expectation is already built into the contract. It was not a risk. It was an impossibility, Your Honor, because it's just a simple prohibition to undertake commercial development. It's a risk because it was a prohibition, which would have been discovered when title search was done and was discovered when title search was done, but the contract itself gave CVS an opportunity to back out in the event that your client couldn't deliver clear title. That's the way the contract was written up. What happened here, Your Honor, is a developer, which is CPC, knowing full well that these covenants were there in place and would thwart the closing because title insurance would not be clear in favor of CVS, despite that reality, that foreseeable situation of a closing that would fail, required these people to leave their premises well ahead of a closing. And not only that, they created a special situation of risk because when the entire block became vacant, damages, looting, vandalism began, upon which CPC as developer provided additional assurances to the plaintiffs that they did not have to worry the closing would take place and the properties would be demolished anyway. That was torturous, and that's independent of the contract obligations, and that's why, if I may finish, Your Honor, my thought? It's up to Judge Gallardo. That is why the plaintiffs are entitled to pursue a cause of action in damages under Article 1802 because that is the breach of the independent duty not to cause harm. You don't engage into a development like this and keep people tied to the contract. There was one little inkling of an argument that had a little bit of merit in my mind, which was that, according to the briefs, your clients asked if they should independently take some steps to protect the property and were told no. Your Honor, that's exactly on the record. Dr. Handala announced to defendant CPC as of June 2017, and that was found by the court below, that damages had already begun taking place, and it's on the record that CPC told plaintiffs that they did not have to concern themselves with the looting, with the vandalism, and the damages to the property because they would soon close and the property would be demolished anyways. That inducement, Your Honor, that representation was simply false, incorrect, and torturous. That stands alone from all the contract duties, and it entitles my clients to pursue a cause of action for damages under Puerto Rico's tort statute, which certainly encompasses negligent conduct on the part of a developer that casts to the wind the reality that there are covenants that prohibit a development like this one, and that's what happened in this case. You seem to say that once they told your clients to abandon in anticipation of the closing, and once they said, no, you don't need to do anything more to protect the property, they, in effect, were guaranteeing that there would be a closing and protecting you should there be no closing. In effect, that's exactly what happened. The representation was, we will close. You do not need to worry about your damages. That sounds like a separate contract. That's a separate source of an obligation. It's a delictual obligation under Puerto Rico's tort statute, Article 1802. To make it broad, you'd have to also say at the time they did that, they knew it wasn't going to close. They knew or should have known it could not close. And they knew or should have known it could not close because you could not build a commercial development in those parcels. Council, I understand you two have acknowledged, at least below, that there is no Puerto Rico law that would apply to the factual scenario that we have here, that in recognizing the availability of a tort action in this commercial transaction setting, the court below, or we, if we agree with you, would be doing something that Puerto Rico law does not currently provide for. Is that correct? You can't cite any Puerto Rico law that really applies to this circumstance. Of course we can, Your Honor. First of all, we're not asking the court to trailblaze or set new law. Under Bonilla v. Chardonnay, cited in our brief, in Puerto Rico, negligent conduct is as wide as. I'm not asking that. In this commercial transaction setting, to allow this tort claim to go forward would indeed be novel, something that no Puerto Rico law currently provides, no cases provide for. I understand the generalities. It would not be novel, Your Honor. It would just be. Fair enough. Thank you. You've answered my question. It would not be novel whatsoever. Thank you. Thank you, counsel. At this time, would counsel for the other appellants, Cruz Morero et al., please introduce herself on the record to begin. Yes, good morning. Jeanette Lopez de Victoria on behalf of the Cruz appellants. If I may reserve three minutes for rebuttal. Yes, you may. Thank you very much. If I would just follow up on my colleague's arguments. There are actually two cases which envision a situation where any actions that cause damages, which are both breach of contract and the result of a tortious conduct, and the court has allowed the action for damages under the tort laws to proceed. And that's the Ramos v. Orientalis Craton Furniture, which is cited in our brief. And there's also another case, which is Ramos-Santiago v. Wellcraft Marine Corps, which that case had to do with a breach of implied warranty, which was a contractual matter, and also a breach of fiduciary duties. And Judge Casillas in that case determined that the action for, under the negligence statute for breach of fiduciary duties could proceed. Is that cited in your brief? I believe it is, yes. If not, I can submit a letter under Rule 28, submitting it to the court. I agree with my co-counsel that there were facts in dispute, particularly around the time that the, nearing the end of both of the contracts and coming close to the closing. In the background between what was going on between the sellers and CPC to close on the properties, there was, as they call it, palace intrigue with CVS trying to do anything they could to it, as they stated in the internal emails, to kill the deal. So there was actions which were being undertaken to derail the closing, and that's exactly what happened. The issue about the title, whether it was, whether it could be recorded or not, as well as the title insurance that could be procured and whether it was. Wait a minute. So, I'm just trying to follow what you're saying. So you're saying that the actions that CVS was undertaking in order to kill the deal is somehow outside of the contract and amounts to a tort? Actually, the district court split this up into two. So actually, the district court treated the potential tort claim within the context of the contract between the sellers, which include my clients, and CPC, which was the entity that was going to develop the properties. The activities by CVS were a side issue that although the two contracts were interrelated, one dependent on the other, there was no contractual relationship between the sellers directly and CVS. But even so, given the interdependence or the symbiotic relationship between the two contracts, those actions of CVS were detrimental and were aimed at derailing the contract. Are you saying that CVS's actions, assuming the interdependence constitute, is something beyond a breach of contract and got into the realm of tortious conduct? What I'm saying is that may have contributed to the tortious conduct and the failure to anticipate, particularly on the part of CPC, that the whole transaction could be derailed. Well, CVS had no duty to your client to not get out of the contract if the contract allowed it to get out of the contract. No direct duty, but they did have the overarching duty under the civil code, under the negligence code, not to do any harm. Well, no. And ultimately, there was. If I have a contract with you that you're depending on for your whole business and under the terms of the contract, I can walk and not perform and call it off. And that would harm you a lot if I do that. But if I exercise my contractual right, you can't then sue me because I violated a duty not to cause harm. No, but that would be the tortious aspect of what was being done. Here's the contract. No, CVS had a contract. The contract gave it a right not to close under certain conditions. Those conditions occurred. It didn't close. How could it be liable? CVS would be liable for the actions that it undertook to derail. There were misrepresentations as far as anything. The whole situation was a ruse. What misrepresentation did CVS make? The misrepresentations were that they were aware of the existence of the restrictive covenants since they first signed the ground lease. Okay, so they hoped that they'd go away, and if they didn't, they wouldn't close. No, they made a conscious decision during the course of the ground lease sometime from 2015 to 2017 that they did not want to continue with any developments or any of the building of any pharmacies in Puerto Rico. Sure, they had a person's right to make that decision under the contract. Well, not when they know that there's a side contract, which was the purchase and sale agreement between the sellers and CPC, which was requiring it was going full steam ahead to try to get to closing, and they were doing everything possible to try to derail the closing. I think you might have better luck if you focused on the other defendant, because they actually, as I understand it, is it CPC? CPC. As I understand it, I'm trying to distill the theory here. I think it's, correct me if I'm wrong, that CPC, you're not suing CPC for failing to close. You're suing CCP because they falsely indicated to you that there would be a closing, hence you let your guard down in protecting the properties. That's part of it. What else is there? Okay, leading up to the summer, right before the closings, there were actions that were undertaken under the ground lease between CPC and CVS. By July 5th of 2017, CVS had already terminated the ground lease. They had given notice that they were going to terminate it. That's information that never reached the sellers. They never knew that the actual closing on the deal was in peril. So even – How is that different from what I just said, which is you're suing them for telling you that they're indicating to you that there was going to be a closing when they knew there wasn't going to be one? It's, I mean, it's similar to what you're saying. Sounds like – I would agree. Similar isn't identical. Is there anything else? And I'm not saying that that's no good. I'm just trying to get my hands around exactly what the conduct is and what duty that conduct violates and how that duty is independent of the contract. Okay. I think that part of the duty, the duty on the part of CPC, because the court actually only – Start with conduct. Okay. And then go to the duty. Okay. The conduct here would be, one, the premature – sorry, can I finish my answer? Yes. Sorry. That would be the premature instruction to vacate the properties. And then the subsequent instruction that they didn't have to take any measures to secure the property. Those two created an expectation in the sellers that the deal would, in fact, close when they already had at least information or inklings in the background in their dealings with CVS that the whole transaction could – it was a possibility that it would not go through. Because of the issue of the restrictive covenants. could have relied on the contract and said, no, we're not going to leave. You're asking us contractually to do something that we have no obligation to do. But at that point – But your client nevertheless chose, you know, made a decision to vacate when they were under no obligation to do that. Doesn't that have some consequences for your tort theory that you can now sue CIP? No, CPC. Excuse me. I'm sorry. For what happened? I don't think so. And this is why. Because I think that they had the expectation that it was closed. And that was, in fact, that was something that was promulgated by CPC. Well, there were shared expectations that they – But the initial – The purchaser also – Yeah, but the initial request that they vacate was in April 2017. They went to a closing in August. So those properties were unoccupied for close to, you know, three or four months. And they – Didn't the contract have a clause in it that said who was responsible for maintaining and protecting the property? The contract said that risk of loss to the properties remained with the sellers. But what it anticipated was normal wear and tear. It didn't anticipate or it didn't even mention anything in the form of vandalism and the extent of the property damage that was occurring here. And it was actually something that was brought to CPC's attention to see if any remedial action should be taken. And that was not done. Thank you. Thank you. Thank you, Counsel. At this time, if Counsel for the Appalachee CPC Carolina could please introduce themselves on the record again. May it please the Court, José Luis Ramirez Coole, on behalf of Appalachee CPC Carolina, Puerto Rico, LLC, otherwise known as CPC. Your Honors, there are several things that are undisputed. First, the relevant contracts here contain a liquidated damages clause. Second, plaintiffs admittedly or sellers in the transaction filed exclusively a tort claim to sidestep the liquidated damages clause. Third, the contracts specifically state that until closing, all risk of loss and title to the properties remain with the sellers. Let's look at the sellers' arguments in oral argument here. Their argument that a separate tort lies because they were induced to vacate their properties months prior to closing. But it seems to me that they understood that they assumed the risk of loss to the property, which is why they approached you once they saw the vandalism was occurring to find out if they should do more. The problem with that statement, Your Honor, is that they are glossing over something that happened prior to the date they were supposed to vacate the properties. And let me explain. The last letter sent by Ms. Florida Rivera was sent on May 16, 2017. Who was it? That was the last letter in the months of April and May telling that the closing... I don't know who that person is. Is that somebody's attorney? Oh, Ms. Florida Rivera was the attorney that was handling the transaction on behalf of CPC. Okay. That letter stated that, and that letter can be found in the record, it stated that the sellers had to vacate the properties by the time of closing. That is, the closing was supposed to take place at that time on May 37, 2017 to June 5, 2017. And the letter expressly states that it makes reference to Sections 5 and 15 of the Purchase and Sale Agreements, or the PSAs. This is Appendix 544 of the Hamdala Briefs. And they asked sellers to vacate the properties by May 31st. What happened before that is what they forget to tell the court about. And what happened is that during the course of closing, remember that this was an assemblage of eight parcels that would be put together for lease to CVS. During the course of closing, it was found out that one of the sellers, none of these sellers, and not CPC or CVS, had failed to disclose to CPC that there was a minor as part of an estate involved in the transaction. And that required court approval. But what does that have to do with them asking... if they should protect the property and you saying no? Well, let me explain. That is pivotal because what they gloss over is the fact that during their depositions, they were all asked, were you aware that this was happening? Yes, they held a meeting where everybody was present at the meeting. Everybody was told that the transaction had to be postponed. And everybody signed an agreement on May 25th, 2017. All of the sellers signed an agreement on May 25th, 2017, one of them on May 18th, where they ratified the purchase and sale contracts. Meaning they ratified that risk of loss lied with the sellers. They ratified the fact that they retained possession before May 31st. And they extended voluntarily the date of closing. And so by doing that, they foreclosed any potential theory that there was somehow a constructive transfer or a creation of a duty outside of the contract. Let me go further into your Honor's question about what they may have or may have not been told about the security measures. I want to be very clear, and this is crystal clear in Appendix 1420 of the Handbala Brief and Appendix 1434. What they asked CPC to do was to put a security guard in the premises. And what CPC said through Ms. Lloyda Rivera was that that was not necessary and that the premises were going to be demolished. As Judge Lippe stated before, it was a fact of the contract that the premises were going to be demolished. In fact, plaintiffs are arguing it in their briefs. You can find it at page 32 of the Handbala Brief, but it was part of the permitting process that CBS was following. Okay, so suppose at that point your client knew with certainty that there was not going to be a closing. And it told them, don't worry, you don't need to protect the premises because there's going to be a closing. Wouldn't that be a tort that's independent of any contractual duty to close? Your Honor, I disagree with that contention for two grounds. Number one, it is a hypothetical that my client thought there was not going to be a closing. There was going to be a closing. And the reason the closing was halted, but go to the second point, Your Honor. It doesn't help to fight a hypothetical by saying that's not the case. Every hypothetical, I'm just asking you not to assume that your client did something, but to try to simplify this case down, it seems they're saying you had a contract, you had certain duties under the contract, but then you told them a lie, and that's a tort. That's in essence what they're saying. The lie was that there was going to be a closing, so get out of the property and don't worry about having to protect it. That's what I distill as their principal claim against you. Why isn't that a tort if it happened? It is not a tort because the duties of the parties were expressly stated in the contract, and the duty to safeguard the property was part and parcel of the seller's duties under the contract. And what sellers are trying to do is to shift the burden, even assuming, as Your Honor is saying, in a hypothetical. You and I have a contract. A hundred dollars, I give you a hundred widgets in 30 days. You call me up in 25 days and say, do you know that contract we've got? I'm going to build a new factory, but it will make no sense unless I get the widgets, so I want to make sure you're going to be sending me the widgets. And I, knowing I'm not going to send them to you, say, yes, I'm going to send them to you, I'm going to live up to my contract, you can rest assured. Isn't that a tort? No, because the fact that the properties would be demolished would not affect the sale of the widgets. Let me explain. Even if the properties had been vandalized, and plaintiffs and sellers argue that they were vandalized by the time the failed closing happened on August 16th, even if the properties had been vandalized, since the purpose of the purchase or the sale of the widgets, in your example, was to demolish the properties and build a pharmacy, CPC would have purchased the properties anyways. And so the example doesn't work exactly, because to tell you, oh, the properties are going to be demolished anyways, it makes no difference, is not a statement outside the scope of the contract, because CPC would have purchased the properties anyways. But it didn't. It didn't for one reason and one reason only, and that's the other thing I wanted to get to. On August 16, 2017, CVS told CPC, as it was its right under the clause, 2.1e of the ground lease between CVS and CPC, that it was not accepting possession of the premises because it had not obtained satisfactory title insurance. Right, but the claim is that you knew, I'm not saying it's correct, but as I understand the claim is, the claim is you knew back in the spring that it wasn't going to close. There is no evidence whatsoever in the record that CPC did not know. I'm just saying that's the claim. So is your argument that that wouldn't be a tort, or is your argument it didn't happen? Both, Your Honor. And how is it not a tort? It's not a tort because the closing has a whole host of conditions precedent. Okay, and number one. Lying isn't a tort in Puerto Rico? It's not a tort because in order for it to be a tort, the general duty to act has to arise from conditions completely separate from the contract. And the change of the situation in which the properties were in. I offer to sell you this knife. You pay $100. I come up, I deliver the knife by sticking it into you. Tort? In that case it would be a tort, Your Honor. But it's a separate act from the contract because the contract does not contemplate. Sorry, Your Honor, if I interrupted you. That's all right. The contract does not contemplate me stabbing you. The contract in this case does contemplate the properties remaining in the same state for all the time prior to the closing. That's why I submit that it's different in your example because there's no tort that can be separate and distinct from the contract. Sure, they have a contractual duty to maintain the premises. They call you up on the phone. They say, you know, we have a contractual duty to maintain the premises. We know under the contract it's clear. But I want to know, should I hire a security guard? I'm not going to do it if I know it's going to close, but I will if it's not going to close. And you say, I know it's going to close, so don't get the guard. If when you say that, you know that it isn't going to close, it seems to me you've made a false representation knowing that I would rely on it. Two things about that, Your Honor. Number one, the representation made was not that it was not going to close and it was not to not place a security guard. The representation made was I'm not placing a security guard because the property is going to be demolished. And, in fact, there was conversations, there were conversations going on on the record, and I'll refer, Your Honors, to, if I may, to Docket 78-9, where there was a letter from CVS to CPC, where CVS had given CPC an opportunity to cure any defaults under the deal that had happened as a result of the miners issue and the delay in closing the transaction. So pursuant to that letter and the communications between CPC and CVS that were on the record, there was an expectation to close the transaction. Counsel, very quickly. I thought I understood you to say that when your client asked that the sellers vacate the premises pending the closing, that there was some kind of subsequent agreement entered into that covered this request and who had responsibilities for the property during this period of time. Did I misunderstand you? The only agreement remained the original agreement. There was no subsequent agreement of any kind. The agreement, Your Honor, was amended on several occasions. And the original closing schedule for May 31st had to be suspended because of the minor issue, issue of the minor, right? On May 25th, all of the sellers, May 18th on one case and May 25th in the other three, signed an amendment where they reaffirmed the agreement in all respects and extended the closing period until October 2017. That's the amendment I'm referring to, Your Honor. And so this amendment reasserted their responsibility to maintain the premises in the condition in which they had been pending the closing? Yes, Your Honor. Even though they were going to vacate the premises? Yes, Your Honor. That's why we're arguing because these agreements were executed before the period for closing expired and they actually state that they reaffirmed that all of the terms of the agreement are kept in force pending the closing and extend the period for closing. Thank you, Your Honors. Thank you, Counsel. At this time, would Counsel for Affiliate Puerto Rico CVS Pharmacy please introduce himself on the record to begin? Good morning. If it may please the Court, Jesus Cruz on behalf of CVS. Assuming that there's a valid claim under 1802 against CVS, that claim expired on August 25th, 2018 because it's time barred. Why is it time barred? There's no question that by August 25th, 2017, the sellers had knowledge of the injury. With regards to CVS, they're claiming two types of injury. Injury number one is the injury of the damage to the properties as a result of the vandalism. That injury took place during the summer of 2017 before August 25th, 2017. In a parents' brief, they make reference to pictures that demonstrate the damage and these pictures were taken on August 13, 2017. So there's no question that by August 25th, 2017, they knew of the injury relating to the vandalism. That's injury number one. Injury number two, again with rewards to CVS, is that they had to keep the damaged properties. They learned that they had to keep the damaged properties on August 25th, 2017 when they received the letter from CPC's attorneys. So with regards to knowledge of injury of both type of injuries, the facts are uncontested that the sellers had knowledge of the injury. We turn our attention to knowledge of the identity of the party that allegedly caused the injury. With regards to injury number one that has to do with the vandalism, in their complaint, they allege two things. They allege that what caused the vandalism in part was the posting of a sign that existed during the summer of 2017 on the property. They're saying that that sign was somewhat of a green light for people to vandalize the property. What did the sign say? The sign identifies specifically CVS and it gives the impression that according to the sellers, and we're not disputing that for purposes of the motion for summary judgment, the properties were going to be demolished. So the sellers allege in their complaint, in the amended complaint, if you go to paragraph 26 and 27 of the amended complaint, you'll see it. They allege that that was an invitation to vandalize. The sign has a roadmap to CVS. With regards to who moved the transformers. So with regards to who moved the transformers, CVS did not move the transformers. There's uncontested evidence. There's a 30D6 witness for the PREPA, the energy company, specifically stating that it has no order from CVS or request from CVS to move the transformers. Who ordered it? It is unclear based on the record. The only admissible evidence that exists is that the energy company does not have an order from anyone requesting that the transformers be moved. Now having said that, having said that, the alleged tort here, which is the removal of the transformers, that occurred during the summer of 2017. The Alejandro Ortiz case from this court is pretty much on point when you're dealing with matters relating to the energy company, the PREPA. The Alejandro Ortiz case is Alejandro Ortiz versus PREPA. One of the things that is written in that case is that everyone in Puerto Rico knows that matters that have to do with the electric supply in Puerto Rico is owned by PREPA. In that particular case, the husband of the plaintiff was electrocuted as a result of a failure with the power line. What Judge Torres wrote in that case was everybody knows in Puerto Rico that the power lines are owned by PREPA. Therefore, if the plaintiff did not have actual knowledge that PREPA was the actor that caused the tort, it had deemed knowledge. In this particular case, Your Honor, is no different in this sense. The tort is the movement, the removal of the transformer. Assuming that... I'm trying to follow what you're saying. So you're saying that it necessarily follows that PREPA, whoever requested it, would have been the entity to remove the transformer? Their theory, Your Honor, and it's in the complaint, that the transformers were removed by PREPA at the request of someone. They knew that the transformers were removed in the summer. Once they know of the injury, the tort, the removal of the transformer, they have a duty to exercise diligence in trying to identify the alleged tortfeasor. At that particular point in time, what they had to do is pick up the phone and call PREPA and ask PREPA who removed the transformer. They did not do that. So the point is, with regards to the removal of the transformer, they knew that their transformers were removed. According to their theory, the removal of the transformer caused injury to them, according to the court. According to the First Circuit interpreting Puerto Rico law and the Puerto Rico Supreme Court, at that particular point in time, they had a duty to act diligently to identify the alleged tortfeasor. In other words, at that particular point in time, they had a duty to pick up the phone and call PREPA, which they didn't do for nine months. They didn't reach out to PREPA until May of 2018. So the bottom line, Your Honor, with regards to the statute of limitations running, it is uncontested. So you're saying that even if CVS removed it, they were on notice that somebody removed it and possibly you. And they're saying that when they noticed the vandalism, CPC told them, don't worry about it. So you're saying that if anybody's responsible, they should look to CPC and not CVS? Because the statute had run as to you. Your Honor, I think their conversations with CPC were more along the lines of, is this deal going to take place? That's how they interpreted it. Their position is that their conversations with CPC told the statute of limitations assurances, told the statute of limitations as it relates to CVS. But as a matter of law, that statement is incorrect. Once again, the Alejandro Ortiz case, which is on point. Because there's no identity of interest. Or identity of persons, I'm sorry. In order to, in order to, for an assurance to toll the statute of limitations, the assurance has to come directly from the tortfeasor. In this particular case, the alleged tortfeasor is CVS. The assurances had to come from CVS. That didn't happen here. It is uncontested that there's no communication between the sellers and CVS. It is uncontested that the very last act, and this is important, of CVS with regards to this transaction was on August 16th. When it told CPC that it was not ready to take possession of the property because the condition precedence under 2.1e had not been met. So, Your Honor, I guess that's pretty much it then. Thank you. Thank you, counsel, at this time. Thank you, Your Honor. Counsel for the Cruz-Morero, please reintroduce yourself on the record. Yes, Jeanette Lopez de Victoria for the Cruz appellants. My colleague's statute of limitations analysis is incorrect and incomplete because it leaves out one very important element under Puerto Rico law, which is the perfect solidarity which exists between CPC and CVS. The Supreme Court of Puerto Rico has said that perfect solidarity is something that is based on the prior or preexisting relations between the parties, their business dealings, and whatnot. In this case, the case evidence establishes clearly that CPC and CVS had an ongoing relationship aside from this one isolated ground lease and purchase sale agreement whereby CPC would purchase land that was then later developed for CVS's pharmacies. In that sense, in this case, since there were extrajudicial letters notified to CVS which were timely and extended the tolling period, it is our position that that tolling was extensive to CVS. In fact, CPC... Wait a minute. You're saying the record support, because I thought the record didn't support... No. That's what the district court, the record supports that there was perfect solidarity because of the prior relations. Let me ask the question. Okay. Are you saying that CPC had purchased property for CVS to develop in locations other than the location before the court? That there were prior instances of exactly. This was not a one shot. In Puerto Rico or somewhere else? It's my understanding that it was in Puerto Rico, but I can clarify that. This was not a one shot deal. There's correspondence going back and forth about prior deals between CPC and CVS that was structured more or less the same way that this deal was structured. Under the law here in Puerto Rico, and particularly the Frijuela case which was resolved in 2012, tolling as to one tortfeasor who was in perfect solidarity with another tortfeasor, tolls it as to the other tortfeasor who didn't necessarily receive the notification. In fact, in correspondence from CPC to CVS after the closing was halted on August 16th, they advised them and they apprised them that there is going to be legal claims brought by the sellers and that CVS may have to respond for them. So CVS was very much on notice. Could you address the argument that there was a May amendment entered into by your clients that put them on notice that the closing was being pushed back and that there was some issue? Right. No, the May amendments were an extension to the terms of the contract. And it was actually the fifth, if I can just finish the answer. Yes. It was the fifth amendment whereby the closing date was extended. And that fifth extension which was signed, I think it was sometime, it was signed in May. The last extension was through October 17th. So at least it created in the seller's mind that the closing could happen any time through October of 2017. There was a representation that that amendment reaffirmed all the other obligations in the contract, including responsibility for maintaining the condition of the properties prior to the closing. Is that a fair representation? It would be a fair representation that the other terms of the contract were included in that extension, yes. Well, isn't that quite consequential for your theory that the CPI committed a tort? In the face of a reaffirmation of a contractual obligation, that the sellers remained responsible for maintaining the condition of the premises. Well, I don't agree with that because by the summer of 2017, CPC already had information that the whole business deal could come apart, precisely because of the problems with matters that were being done by CVS, matters with the restrictive covenants. Notwithstanding that, that information was never transmitted to the sellers. They were in the dark as far as everything that was going on between CPC and CVS in the background. So they acquiesced to that last extension, even two months beyond the date that the deal was actually supposed to close, which was on August 17th, 2017. Thank you. Thank you very much. Thank you, counsel. That concludes our unanimous case.